UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

JOSHUA P. ENDRES, et al.,

    Plaintiffs,

    v.

WELLS FARGO BANK, et al.,

    Defendants.
_____/

No. C 06-7019 PJH

**ORDER DENYING MOTION FOR CLASS CERTIFICATION**

Plaintiffs' motion for class certification came on for hearing before this court on December 19, 2007. Plaintiffs appeared by their counsel Richard D. McCune, and defendants appeared by their counsel Sonya D. Winner and David Jolley. Having read the parties' papers and carefully considered their arguments, and the relevant legal authority, and good cause appearing, the court hereby DENIES the motion.

**BACKGROUND**

This is a proposed class action brought under the Consumer Legal Remedies Act, California Civil Code §§ 1750, et seq. ("CLRA"); the Unfair Business Practices Act, California Business & Professions Code §§ 17200, et seq. ("UCL"), and the National Bank Act, 12 U.S.C. §§ 85-86.

Plaintiffs seek restitution and disgorgement of all profits gained by defendants Wells Fargo & Company and Wells Fargo Bank, N.A. ("Wells Fargo" or "the Bank"), on payments of allegedly improper fees and charges on Wells Fargo's "College Visa Credit Card," and also seek injunctive relief.

Named plaintiffs Joshua Endres ("Endres") and Kendahl Boostrom ("Boostrom") were students when they opened checking accounts at Wells Fargo Bank. They assert that a Bank representative recommended that each of them apply for a College Visa Credit Card account in addition to the checking account, and told them that the College Visa Credit Card account would provide "overdraft protection" for the checking account.

Plaintiffs allege that Wells Fargo did not disclose that if they overdrew the checking accounts, they would be charged $10.00 per day for each credit access, in addition to the 21.80% interest on the credit line; did not disclose that the amount transferred from the credit card would be the minimum to cover the overdrafts, and not a larger amount that would protect them from becoming overdrawn the following day (in the event that additional checks were presented for payment). Plaintiffs also claim that Wells Fargo did not disclose that the terms of the contract would be enforced under Nevada or South Dakota law, and failed to inform them of the consequences of the application of Nevada or South Dakota law in lieu of California law.

Plaintiffs assert that as a result of Wells Fargo's failure to make these disclosures, they accessed the overdraft protection feature numerous times and were damaged by the resulting charges.

Plaintiffs now seek an order certifying (a) a "California Class" consisting of "all Wells Fargo California student customers who obtained overdraft protection through their Wells Fargo credit card that signed up for the program from January 1, 2002 through December 30, 2005, and received their first overdraft protection transaction fee after October 2, 2002;" and (b) a "National Class" consisting of "all Wells Fargo Non-California student customers who obtained overdraft protection through their Wells Fargo credit card that signed up for the program from January 1, 2002 through December 30, 2005, and received their first overdraft protection transaction fee after October 2, 2002."[1]

---

[1] This definition of the two proposed classes is taken from plaintiffs' memorandum of points and authorities in support of the motion. In their notice of motion, they state that they seek an order "certify[ing] the class of persons described in [p]laintiffs' complaint as two separate classes" – a California Class and a National Class. In the SAC, plaintiffs describe

2

**DISCUSSION**

A. Legal Standard

Whether an action warrants class treatment is a matter to be decided "[a]t an early practicable time after a person sues or is sued as a class representative." Fed. R. Civ. P. 23(c)(1). While the court will often find it necessary to look beyond the pleadings before "coming to rest on the certification question," Gen'l Tel. Co. of Southwest v. Falcon, 457 U.S. 147, 160 (1982), the court is not permitted to make a "preliminary inquiry into the merits" of the plaintiffs' claims at that stage of the litigation, Eisen v. Carlisle & Jacquelin, 417 U.S. 156, 177 (1974). Nevertheless, the court must consider evidence relating to the merits if such evidence also goes to the requirements of Rule 23. Hanon v. Dataproducts Corp., 976 F.2d 497, 509 (9th Cir. 1992).

A district court may certify a class only if

(1) the class is so numerous that joinder of all members is impracticable;

(2) there are questions of law and fact common to the class;

(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. P. 23(a)

In addition, the court must find that the proposed class fits within one of the subcategories of Rule 23(b). In the present case, plaintiffs seek to certify the class under subsection (b)(3), which requires that "the court find[ ] that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and

---

the California Class as consisting of "all persons similarly situated who reside within California and who, within the statutory period, incurred daily credit line transfer fees or similar fees in connection with the use of a Wells Fargo College checking account and College Visa Credit Card;" and the National Class as consisting of "all persons similarly situated who reside within the United States and who, within the statutory period, incurred daily credit line transfer fees or similar fees in connection with the use of a Wells Fargo College Checking account and College Visa Credit Card." SAC ¶ 61-62.

3

efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3).

The party seeking certification bears the burden of showing that each of the four requirements of Rule 23(a) and at least one requirement of Rule 23(b) have been met. Zinzer v. Accufix Research Inst., Inc., 253 F.3d 1180, 1186, amended, 273 F.3d 1126 (9th Cir. 2001).

B.  Plaintiffs' Motion

1.  Rule 23(a)

Plaintiffs argue that the proposed class(es) meet all the requirements of Rule 23(a). In opposition, Wells Fargo concedes that there are some common issues, but asserts that Endres and Boostrom do not meet the requirements of typicality, and therefore cannot be adequate representatives.

a.  Numerosity

Rule 23(a)(1) requires that the class be "so numerous that joinder of all members would be impracticable." Fed. R. Civ. P. 23(a)(1). Plaintiffs contend that the proposed class is numerous, as there are "hundreds of thousands" of Wells Fargo customers that comprise the class, and that the average loss per customer was $54. Wells Fargo does not contest that numerosity is satisfied.

b.  Commonality

Rule 23(a)(2) requires that there be "questions of law or fact common to the class." Fed. R. Civ. P. 23(a)(2). Commonality focuses on the relationship of common facts and legal issues among class members. "All questions of fact and law need not be common to satisfy the rule. The existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." Hanlon v. Chrysler Corp., 150 F.3d 1011, 1019 (9th Cir. 1998).

Plaintiffs contend that the common issues of fact in the present case include whether the uniform contracts were unconscionable, and whether Wells Fargo's written documents and oral representations made to the customers before the customers signed up for the checking accounts, the credit cards, and the overdraft protection feature constituted an

4

unfair business practice based on the non-disclosure of the cost of the overdraft protection.

Plaintiffs point to Wells Fargo's "uniform sales practice" as a strong indicator of commonality of factual issues, asserting that the Bank had a well-defined system in place that dictated how the program was presented to student customers. Plaintiffs cite to the deposition testimony of a Wells Fargo Vice President who testified that Wells Fargo had centralized a student marketing department to sell this program to students throughout the United States. They also cite to the deposition testimony of Linda Caldwell, to show that Wells Fargo salespeople used a software program that prompted the salespeople to take certain actions related to the student checking accounts and to provide certain information to the customers. Plaintiffs argue that this program was created specifically to insure uniformity and consistency in the sales process.

As for the written materials, plaintiffs contend that Wells Fargo branches were provided with marketing brochures that described the college checking account and the college credit card, and that some of the marketing brochures were used in the sales process. Plaintiffs contend that these are the relevant documents regarding disclosure, as they were provided to the customers before they actually signed up for the accounts.

Plaintiffs argue that the documents provided after the customers signed up for the accounts were also uniform. For example, after each customer was approved for the credit card, he/she received a "VISA or Mastercard Customer Agreement and Disclosure Statement" ("Disclosure Statement") in the mail. Plaintiffs assert that it was this document that for the first time disclosed the cost and the method of transferring funds from the credit card to the checking account.

Plaintiffs point to the practice of the overdraft protection feature itself as a strong indicator of commonality, asserting that there is "no question" that Wells Fargo's program of linking an overdraft protection feature between the checking account and the credit card account was uniformly applied to all class members. They note that the practice included the assessment of a $10 fee for each day an overdraft transaction occurred (regardless of the number of insufficient funds or "NSF" checks that were presented for payment on a

5

single day), and the practice of transferring the exact amount of the overdraft (as opposed to some "larger" amount).

Finally, plaintiffs contend that common questions of law also predominate, including whether Wells Fargo's practices are lawful, unfair, and unconscionable in violation of the CLRA and the UCL, and whether the fees and interest charged by Wells Fargo for accessing the credit line under the overdraft protection feature amounted to an interest rate that constituted usury under § 85 of the National Bank Act.

In opposition, Wells Fargo argues that while there may be common issues, they do not predominate over the individual issues, as required under Rule 23(b)(3). Wells Fargo provides evidence showing that the oral presentations were far from uniform; that the written materials and advertising campaigns varied from one part of the country to another; that the Disclosure Statement was mailed to the account holder after the credit card application had been approved; that the account was not actually opened until the account holder activated the card after receiving it along with the Disclosure Statement; and that once the account-holder received the Disclosure Statement, he/she was free to cancel the account.

        c.     Typicality

Rule 23(a)(3) requires that "the claims or defenses of the representative parties [be] typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). "[A] class representative must be part of the class and possess the same interest and suffer the same injury as the class members." Falcon, 457 U.S. at 156.

The "typicality" and "commonality" requirements are similar and tend to merge. Id. at 157 n.13. The test of typicality is whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named plaintiffs, and whether other class members have been injured by the same course of conduct." Hanon, 976 F.2d at 508 (citation and quotation omitted). The claims of the representative class members must "reasonably coexist" with those of the absent class members, but "need not be substantially identical." Hanlon, 150 F.3d at 1020.

Endres and Boostrom argue that their claims are typical of those of the class. According to plaintiffs, Endres opened a checking account at a Wells Fargo branch located in Yucaipa, California, in September 2002, when he was an 18-year-old college student. Prior to opening the checking account, Endres spoke to Ms. Caldwell, a Wells Fargo representative. Plaintiffs claim that Ms. Caldwell persuaded Endres to open a College Visa Credit Card account as well, by telling Endres that the credit card account would provide overdraft protection for the checking account, and would save Endres from being charged expensive overdraft fees.

Endres testified in his deposition that Ms. Caldwell did not advise him of the fees associated with the overdraft protection program, or the practice of transferring the exact amount, but did advise him that the fee for an overdrawn check (in the absence of the overdraft protection) would be $25. Endres testified that had Wells Fargo provided him with disclosure information about the true cost of the overdraft protection program, he would not have obtained the credit card or the overdraft protection.

Plaintiffs argue that Endres was subjected to the same practices as the rest of the class members, that he is within the definition of the class, and that his claims are typical of the claims of the class. Plaintiffs contend that there is no dispute that the documents Endres was provided before he signed up for the account did not include disclosure of the fee and practice (although Ms. Caldwell disputes Endres' claim that she did not tell him about the fee).

Plaintiffs assert that Endres relied on Wells Fargo's representations concerning the overdraft protection program, and that as a result of Wells Fargo's failure to disclose the fees, Endres was charged multiple $10 fees, which were increased by the fact that the minimum amount was transferred each time. For example, plaintiffs contend, Wells Fargo charged Endres $70.00 in one statement to access $77.67 of his credit line, in addition to the 21.80% Wells Fargo charged in interest on the credit line. They assert that the daily charges included $10.00 each for a credit access of $0.92 on March 9, 2004, $11.11 on March 10, 2004, and $1.71 on March 11, 2004, and that in the three day period from March

7

9 through March 11, 2004, Endres was charged $30.00 to access $13.74 from his credit card.

As for Boostrom, plaintiffs contend that in August 2004, when she was an 18-year-old recent high school graduate preparing to start college, she submitted a Wells Fargo College Visa Credit Card account application. According to plaintiffs, it is "not completely clear" when Boostrom signed up for the credit card, as she apparently received the card about a year after opening a college checking and savings account. However, she also testified in her deposition that she did not recall actually applying for the card. It was when she received the credit card that the card was linked to her checking account to provide the same overdraft protection that Endres (and the other purported class members) had.

Boostrom testified that while she knew she had received some documents from Wells Fargo when she opened the account, she did not recall reading any disclosures that revealed the fees associated with using the overdraft protection feature. She claimed that if she had been aware of the fees, she "would not have just jumped right in," but would instead have spoken to her father or looked to see if other banks charged similar fees. She also testified, however, that once she learned about the fees, she felt it was too much trouble to close the Wells Fargo account, as she could not afford to pay off the balance owing on the card.

Plaintiffs argue that Boostrom was subjected to the same practices as the rest of the class members, that she is within the definition of the class, and that her claims are typical of the claims of the class. They contend that Boostrom relied on Wells Fargo's representations concerning the overdraft protection feature on her account, and on Wells Fargo's nondisclosure of the fees associated with using the overdraft protection feature.

Plaintiffs assert that as a result of Wells Fargo's failure to disclose the fees, Boostrom accessed the overdraft feature numerous times, and was damaged by the resulting charges. For example, they claims that Wells Fargo charged her $30.00 in one statement to access $44.61 in overdraft protection.

In opposition, Wells Fargo argues that Endres' and Boostrom's claims are not typical

of the claims of the class. Wells Fargo combines much of its response regarding typicality with its discussion of adequacy of representation, asserting that Endres and Boostrom are not adequate representatives because their claims are not typical of the claims of the class.

Wells Fargo makes three main arguments. First, Wells Fargo asserts that neither of the named plaintiffs has standing to challenge Wells Fargo's marketing materials. Both Endres and Boostrom admitted in their depositions that they never read any of the written disclosures provided to Wells Fargo cardholders. Wells Fargo contends that because Endres and Boostrom cannot establish reliance or causation, and therefore have no standing to challenge any of the advertisements or written disclosures at issue in this litigation, they fail to satisfy the typicality requirement.

Second, Wells Fargo argues that Boostrom is not typical because she suffered no actual injury, and therefore lacks standing on that basis. Boostrom admitted in her deposition that she did not pay her own credit card bills – all of her credit card statements and other communications from Wells Fargo (which she never sees) are mailed to her parents' address, and her parents pay the bills directly, with their money, not hers. Thus, Wells Fargo asserts, at a minimum, Boostrom is subject to unique and atypical defenses for this reason.

In addition, before Boostrom signed up for the credit-card overdraft protection feature in September 2004,[2] she had already been enrolled for some months in a substantially similar program that was linked to her Wells Fargo savings account. Thus, Wells Fargo argues, she had no reason to be ignorant about the nearly identical feature she later signed up for with her credit card.

Third, Wells Fargo contends that Endres is not typical because his claims are barred by the statute of limitations. According to the SAC, Endres applied for his Wells Fargo credit card and received the oral representations which form the basis of his claims on

---

[2] Although Boostrom claimed not to recall how she obtained the credit card, Wells Fargo's records show that Boostrom applied for the credit card via Wells Fargo's website.

9

September 6, 2002.

The CLRA provides that actions shall be commenced "not more than three years from the date of the commission" of the unlawful act. Cal. Civ. Code § 1783. This period runs "from the time a reasonable person would have discovered the basis for a claim." Massachusetts Mut. Life Ins. Co. v. Superior Court, 97 Cal. App. 4th 1282, 1295 (2002). Endres did not file the complaint in the present action until October 2, 2006 – more than 4 years later.

Wells Fargo asserts that there can be no doubt that Endres would reasonably have discovered the alleged misrepresentation when he first incurred a fee in November 2002 – almost four years before he filed the present action. Thus, Wells Fargo asserts, Endres' CLRA claims are time-barred, and he cannot represent a class on those claims.

An action under the UCL must be commenced "within four years after the cause of action accrued." Cal. Bus. & Prof. Code § 17208. The UCL limitations period begins to run at the time of the alleged misrepresentation, not on the date of its discovery by the plaintiff. Karl Storz Endoscopy Am., Inc. v. Surgical Techs. Inc., 285 F.3d 848, 857 (9th Cir. 2002). Wells Fargo contends that Endres' UCL claims are also time-barred, because the alleged misrepresentation occurred in September 2002.

Finally, actions for violation of § 85 of the National Banking Act must be "commenced within two years from the time the usurious transaction occurred." 12 U.S.C. § 86. The "transaction" at issue is the actual payment of the challenged interest. McCarthy v. First Nat'l Bank, 223 U.S. 493, 498-99 (1912). Thus, Wells Fargo contends, Endres cannot recover on a National Banking Act claim for any payment made to Wells Fargo for overdraft protection fees before October 2, 2004 – which excludes more than half the alleged class period.

Plaintiffs appear to concede that Endres' claims are time-barred as regards the "non-disclosure" claim, but they assert that the UCL and usurious and unconscionable interest claims are still viable, as they were ongoing throughout the time he used his card, and are therefore within the statute of limitations. Plaintiffs contend that each time Wells Fargo

10

engaged in the challenged "practice," that action triggered a new claim.

As for Boostrom, plaintiffs dispute the Bank's claim that she was not damaged because she was not the one who paid the credit card bills. They contend that because she remained legally obligated to pay the bills – regardless of who actually paid them – and because she at some point intends to begin paying the bills herself, she was "damaged" by the fact that her parents paid the excess fees on her credit card.

### d. Adequacy of representation

Rule 23(a)(4) requires that "the representative parties . . . fairly and adequately protect the interests of the class. Fed. R. Civ. P. 23(a)(4). This factor requires that the proposed representative plaintiffs not have any conflicts of interest with the members of the proposed class, and that plaintiffs be represented by qualified and competent counsel. Hanlon, 150 F.3d at 1020.

Plaintiffs contend that they are adequate representatives, as they have a strong interest in challenging Wells Fargo's practice on behalf of a larger class of Wells Fargo customers, and have demonstrated their interest by bringing the action and ably participating in the suit, including engaging in the discovery process.

Plaintiffs also assert that their retained counsel are qualified and competent. Plaintiffs note that Richard McCune of McCune & Wright, LLP, has extensive class action experience, and has represented plaintiffs in class actions in both state and federal court.

In opposition, Wells Fargo argues that class certification is inappropriate because plaintiffs Endres and Boostrom are not typical, for the reasons discussed above, and therefore cannot adequately represent the class.

### 2. Rule 23(b)(3)

Plaintiffs assert that this action is properly maintained as a class action under Rule 23(b)(3), in that common questions of law and fact predominate over any questions affecting only individual members, and because a class action is superior to other available methods for a fair and efficient adjudication of the controversy. Wells Fargo disputes plaintiffs' claim that common issues predominate.

11

### a. Predominance of common questions of law and fact

Plaintiffs argue that Wells Fargo's sales practice of nondisclosure in oral presentations and written documents is uniform to the class. Plaintiffs also argue that neither the differences in the calculation of damages among the class members, nor the differences in state consumer protection laws for the National Class will defeat commonality.

Plaintiffs contend that applying California consumer protection laws to the National Class is appropriate because of California's great interest in regulating Wells Fargo, a California-based company that made the decisions regarding nondisclosure in California. Plaintiffs assert that because California consumer protection laws are consistent with the purpose and intent of every other state's consumer protection laws, applying California law to the National Class is appropriate.

Plaintiffs argue further that the California causes of action (CLRA and UCL) should apply on behalf of members of the National Class who do not reside in California because California has the strongest interest in applying its laws to this case.

In opposition, Wells Fargo asserts that class certification is inappropriate because individual issues predominate over common ones in this case. Wells Fargo asserts, first, that class certification is inappropriate where, as here, class members were exposed to a widely disparate mix of information. Wells Fargo contends that the proposed class consists of customers who were exposed to very different advertisements and/or oral discussions – or in some cases, to none at all – and whose actual reliance on what they did see or hear was subject to a wide variety of individualized circumstances.

Wells Fargo provides evidence showing that the written advertisements varied over time and geographical location, and that the challenged oral statements varied from speaker to speaker and customer to customer. Wells Fargo argues that claims involving non-standardized, widely-varying oral representations are particularly inappropriate for treatment as a class action. Wells Fargo also contends that each customer was provided with clear written disclosures of both the $10 fee and the exact-amount transfer policy, and

that the record confirms that some class members read these disclosures and that the disclosures were easily understandable to anyone who did read them.

Second, Wells Fargo contends that even apart from the variations in the mix of information provided to class members, individual issues of reliance and causation predominate. Wells Fargo asserts that even if the statements made to class members on the subjects at issue had been uniform, it would not logically follow that they would have relied on such statements in opening their credit card accounts and in choosing overdraft protection.

Wells Fargo asserts that the materiality of a representation will hinge on which portions of the representation each of the class members actually read. Wells Fargo argues that plaintiffs received written disclosures about the very aspects of the overdraft protection program by which they claim to have been misled, and that reliance and causation for each class member will necessarily turn on individualized questions about whether the customer read and considered the written disclosures

Third, Wells Fargo argues that determination of actual injury would require individualized proof as to each class member. Wells Fargo asserts that the court would need to determine whether each class member knowingly incurred one or more overdrafts that he/she would not have incurred otherwise because he/she was under the mistaken impression that the overdraft protection was free. Because the $10 overdraft protection fee was less than the standard $18-33 per transaction overdraft fee that a class member would ordinarily have incurred if he/she wrote an NSF check, Wells Fargo argues that a customer cannot have incurred injury simply because the overdraft protection program was more expensive than he/she thought.

Thus, Wells Fargo asserts, even though Endres claims he would not have signed up for the overdraft protection feature had the fee been fully disclosed to him, it does not follow that he was injured. To determine injury, the court would have to ascertain whether Endres would still have incurred the overdrafts for which the fees were paid. If those overdrafts would have been incurred anyway, Endres paid less in fees than he would have without the

13

overdraft protection, and thus suffered no injury.

Wells Fargo also contends that to the extent that plaintiffs are challenging the bank's policy of advancing only the exact amount of an overdraft from a customer's credit card, their claim rests on the assumption that the transfer of a higher amount would have enabled the customer to avoid having another overdraft protection fee for another small overdraft a day or two after the first one. However, Wells Fargo notes, only those class members who incurred multiple small overdrafts in this kind of situation could have been injured under this scenario. Determining who those class members are would require examination of each individual class member's account history, and would also require determining what amount each individual class member believed would be transferred when the overdraft protection feature was triggered by the submission of an NSF check.

Wells Fargo adds that even for those class members who did incur overdraft protection fees they would not have incurred otherwise, additional individualized analysis would be required to ascertain whether each such class member was actually injured. Advancing more funds might have reduced the number of separate $10 fees charged, but it would also have increased the amount of interest charged on the advance, and the resulting credit-card balance. Wells Fargo contends that analyzing whether a particular plaintiff is better or worse off under one approach, as opposed to another, will require a complex and highly individualized assessment of the individual's checkwriting patterns.

Fourth, Wells Fargo argues that the application of affirmative defenses would require individualized analysis as to each class member. For example, Wells Fargo notes that plaintiffs have defined their proposed class, roughly, to include student customers who signed up for the overdraft protection feature from January 1, 2002, through December 30, 2005. However, because this group would include people whose claims are, like Endres' claims, time-barred, the court would have to conduct an individualized inquiry to determine whether any particular individual's claim was viable.

Wells Fargo also asserts that plaintiffs' claims will fail for any class members who continued to incur and voluntarily pay the fees at issue after learning the information about

14

the overdraft protection. Wells Fargo contends that once the existence of the fee, and the "exact amount" transfer policy became apparent, class members should have closed their accounts, cancelled their credit cards, or, at a minimum, discontinued using the overdraft protection feature. Instead, many (including Endres and Boostrom) continued to incur the fees and pay them. Wells Fargo argues that under Lopez v. Wash. Mut. Bank, F.A., 302 F.3d 900, 904 (9th Cir. 2002), class members who repeatedly incurred and voluntarily paid the fees at issue have implicitly consented to the fees through their conduct, and therefore lack standing to challenge them. Wells Fargo contends that the need to determine which class members lack standing is another individualized question that makes this case unsuitable for class treatment.

Finally, Wells Fargo also contends that there are additional barriers to the certification of a National Class – plaintiffs have identified no class representative for a National Class; and nationwide class treatment is inappropriate where class members are subject to contractual arbitration agreements and/or class action waivers that may be enforceable as to residents of states other than California;

In reply, plaintiffs assert that common questions predominate over individual issues. With regard to the Bank's argument that individualized assessments will be required because of variations in advertising brochures, oral presentations, and written materials provided before the accounts were opened, plaintiffs assert that the oral presentations and written documents were "uniform in non-disclosure" because none of them disclosed the finance charges at the "point of sale" (apparently referring to the credit card application process).

As for any variations in the application process, as among customers who applied for a card over the telephone vs. those who applied over the Internet vs. those who applied in-person, plaintiffs propose that even if the court agrees with the Bank, the solution is not to deny class certification, but rather to break the "small discrete groups of customers who signed up with Wells Fargo on the telephone or over the Internet into subclasses."

As for the Bank's argument that individualized issues of reliance and causation

15

predominate over common issues, plaintiffs contend that an "inference of common reliance" may be applied to UCL and CLRA actions where there is a material misrepresentation consisting of a failure to disclose a particular fact. Plaintiffs claim that in the present case, Wells Fargo "uniformly omitted material terms" of the program as to all class members.

With regard to the Bank's argument that variations in damages will require an individualized assessment, plaintiffs contend that it will be easy for the Bank to determine by performing a run of computerized data, how much each cardholder was charged for Overdraft Protection.

Finally, as for the Bank's claim that Endres and Boostrom voluntarily paid the fees, and that their claims are barred on that basis, plaintiffs simply assert that this is an affirmative defense that is "without merit," and that "[h]ow it affects individuals in the class will be determined by the resolution of the common question and again a computer analysis will simply identify those class members affected by the [c]ourt's determination."

Moreover, plaintiffs contend that the SAC raises three distinct challenges to Wells Fargo's practice of assessing a finance charge of $10 each day there is a transfer as a result account-holders' accessing the "credit line" by writing an NSF check, and of transferring only enough funds to bring the checking account balance to $0 – a claim of failure to disclose, which Wells Fargo focused on in its opposition to the present motion; (2) the claim that the practice constitutes an illegal and unfair business practice, and (3) a claim that the practice results in the assessment of usurious finance charges.

Plaintiffs assert that the Bank's arguments regarding the predominance of individualized issues and lack of typicality go only to the "non-disclosure" portion of the case, and not to the other two issues – whether the challenged "practice" was an unfair and illegal business practice, and whether the fee charged was usurious. As to those issues, plaintiffs claim that the "practice" was the same for each class member.

Plaintiffs contend that even if the court finds that variations in disclosure defeat class certification (which plaintiffs do not concede), the case should still proceed as a class action on the claims of illegal and unfair business practices and usurious and unconscionable

16

interest rates.

    b.  Superiority of Class Action Treatment over Individual Actions

  Plaintiffs argue that a class action would be superior to other available means for the fair and efficient adjudication of this controversy. They contend that the damages suffered by the individual class members are small compared to the burden and expense of individual prosecution of the complex and extensive litigation that plaintiffs claim will be needed to address Wells Fargo's conduct. Moreover, plaintiffs assert, the court system could not handle all those individual lawsuits; and individualized litigation would increase the delay and expense to all parties, and would likely result in inconsistent adjudication.

  Plaintiffs assert that the class action device presents far fewer management difficulties, allows the hearing of claims that might go unaddressed because of the expense of bringing individual lawsuits, and provides the benefits of single adjudication. Plaintiffs contend that a class action would be appropriate here, where Wells Fargo's practices are uniform and common issues of law predominate over individual issues.

  3.  Discussion

  The court finds that the motion must be DENIED, because plaintiffs have not met their burden of establishing that the claims of the proposed class representatives are typical of the claims of the class, or that common issues predominate over individual issues. In particular, the court finds that maintenance of a class action pursuant to Rule 23(b)(3) would be inappropriate because plaintiffs' claims would require individualized inquiries into the circumstances of each member of the class, and those individual inquiries would predominate over common questions of law and fact.

  For example, the application of affirmative defenses would require an individualized analysis as to each class member. These include the applicability of the voluntary-payment doctrine, which may bar any claims made by class members who continued to incur and voluntarily pay the overdraft protection fees; and the question whether plaintiffs' CLRA, UCL, and National Banking Act claims are time-barred.

  Plaintiffs have provided no evidence to support their theory that a "computer

17

analysis" could provide a quick fix to the wide variety of individual issues presented in this case. As Wells Fargo notes, many of the individualized questions presented here require a determination as to each particular class member's knowledge or state of mind. For example, the statute of limitations and liability determinations are based, in part, on whether and when a particular class member heard or read the alleged misrepresentations (or the Bank's disclosures). Plaintiffs have not explained how those issues can be resolved through "computer analysis." Similarly, issues relating to consumer consent can be determined only through an analysis of customer-by-customer state of mind, which information is not available in any computer database.

As for the questions of actual injury and the amount of damages, plaintiffs have provided no evidence whatsoever that any "computer analysis" could convert those individualized issues into common questions. For its part, Wells Fargo has provided a declaration from its Division Finance Officer of its credit card operations, stating that injury and damages determinations for any particular customer would require a complex and highly individualized analysis of that customer's drafting patterns, the timing and extent of his or her overdrafts, and his or her credit card balances, interest rates, and payment practices.

The court finds that individual issues also predominate over common issues under plaintiffs' unconsionability/usury theory. As Wells Fargo points out, any determination of actual injury would require individualized analysis as to each class member, just as an individualized, customer-by-customer analysis would be required under the failure-to-disclose theory.

Plaintiffs' unconscionability/usury theory challenges the Bank's practice of advancing only the exact amount of an overdraft, and then charging a second $10 overdraft fee if the customer requires another overdraft protection advance shortly thereafter because he/she has incurred another small overdraft. This theory, like the failure-to-disclose theory, rests on the assumption that the transfer of a higher amount would have enabled the customer to avoid a second overdraft protection fee for a second small overdraft a day or two after the

18

first one.

However, only those class members who actually incurred multiple small overdrafts within a short period of time could be injured under this scenario. And even for those class members, additional analysis would be required to determine whether the extra fees incurred were offset by savings on the higher interest charges that the customer would have accrued under the alternative minimum-amount transfer policy. Such an analysis would require an assessment of each customer's spending patterns, overdraft transaction details, credit card balances, interest rates, and payment practices.

Moreover, even if it were true, as plaintiffs contend, that Wells Fargo's arguments regarding typicality and predominance of individualized issues apply only to the non-disclosure aspects, and not to the other aspects, plaintiffs still have not established that the action should be certified as a class action.

It is true, as plaintiffs argue, that the overdraft protection feature was uniformly applied to all members of the proposed class, in that all members were subjected to the same $10 fee and the same "minimum transfer" practice. However, the issues raised by Wells Fargo with regard to Endres and Boostrom are sufficient to show a lack of typicality. In addition, the predominance of individualized issues with regard to the "disclosure" aspects of the case is sufficient to establish that common issues do not predominate.

## CONCLUSION

In accordance with the foregoing, the court finds that the motion must be DENIED.

**IT IS SO ORDERED.**

Dated: February 6, 2008.

PHYLLIS J. HAMILTON
United States District Judge

19